**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0632n.06
Filed: August 29, 2007

**No. 05-2607**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JOAN MARIE MURRAY-RUHL, Personal )
Representative of the Estate of Michael )
Dean Murray, Deceased, )
  )
     Plaintiff-Appellant, )
  )
v. )  ON APPEAL FROM THE UNITED
  )  STATES DISTRICT COURT FOR THE
THOMAS PASSINAULT and JASON )  EASTERN DISTRICT OF MICHIGAN
JENKINS, )
  )
     Defendants-Appellees. )
  )
  )

Before: BOGGS, Chief Circuit Judge, DAUGHTREY, Circuit Judge, and MILLS,[*] District Judge.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Plaintiff Joan Marie Murray-Ruhl filed this civil rights action under 42 U.S.C. § 1983, claiming that Shiawassee County (Michigan) Deputy Sheriffs Thomas Passinault and Jason Jenkins acted unreasonably in using deadly force against her son, Michael Murray, in violation of his Fourth Amendment rights. She now appeals the district court's grant of summary judgment to the defendants based on the court's determination that they were entitled to qualified immunity in the fatal

---

[*]The Hon. Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

shooting of Murray. We affirm the grant of summary judgment to defendant Jenkins. However, because we conclude that the record reflects genuine disputes of material fact concerning the reasonableness of defendant Passinault's action, we find it necessary to reverse the grant of summary judgment to him and remand the case to the district court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Although the parties' versions of the facts surrounding the actual shooting conflict, the facts leading up to the event are essentially undisputed. The record establishes that on the evening of September 5, 2003, Murray and a friend, Ryan Conklin, attended a party at the home of a mutual friend. According to Conklin, the pair arrived sometime before midnight and left when the party broke up several hours later. Murray and Conklin agreed to drive two young women, Rebecca Rodriguez and Corey Straub, home from the party. Conklin dropped off Murray and Rodriguez at Uncle Buck's bar, where Murray had parked his truck earlier in the evening, then left to take Straub home.

Murray, with Rodriguez sitting in the passenger seat, was pulling out of the Uncle Buck's parking lot when he saw the defendants' patrol car drive by. In a moment of panic, presumably because he had violated his parole by consuming alcohol earlier that evening, Murray attempted to avoid the police by driving across adjacent parking lots and pulling into an alley that opened into a parking lot for nearby businesses. Murray turned off the truck's

lights and engine, ducked down in his seat to hide from the police, and told Rodriguez to do the same.

Jenkins and Passinault observed Murray's truck exiting the lot near Uncle Buck's and followed it, concluding the truck was being driven erratically. Ultimately, the officers located the truck in the alley and parked directly behind Murray's vehicle, blocking it. Jenkins and Passinault got out of the patrol car and, seeing no visible occupants in the truck, began to search the surrounding area on foot. After the officers passed by, Murray started the truck's engine. Beyond that point, the facts of this case are highly disputed.

**The Defendants' Version of the Facts**

The defendants claim that after Murray started the truck, he accelerated directly toward Passinault, who was standing next to a pole barn approximately 165 feet north of the truck. Jenkins and Passinault also assert that Passinault was "effectively trapped between the truck and the pole barn."[1] According to the defendants, Passinault repeatedly ordered the driver of the truck to stop, but his orders were disregarded and the driver of the truck continued accelerating toward him. Passinault gave conflicting accounts of how close

---

[1]Despite the characterization as undisputed fact in the concurring opinion that "while approaching Passinault within eight feet, Murray was accelerating enough to cause his tires to spin and to lose control of his truck," the record fails to establish the officer's precise location when the truck left tire marks on the pavement. The forensic report states that heavy acceleration caused the tires to spin, but it is possible, based on the evidence that is in the record, that the truck did not begin to lose control and rotate until Murray turned the wheel in order to avoid hitting Passinault.

the truck came as it passed him, eventually testifying that it was between one and eight feet away from where he was standing when he fired the first shot at the driver. But immediately after the shooting and for some days afterward, he reported that he had been hit by the truck and injured – even going so far as to call for an ambulance to come to the scene because he needed medical attention. However, that version of the facts turned out to be a complete fabrication.

In truth, Passinault had not been hit by the truck and continued shooting after it had passed him, claiming later that he believed that the driver might be heading toward his partner, Jenkins, who was on foot somewhere in the area. Passinault also asserts that he fired at the truck as it was driven away from him because he was concerned for the safety of other officers who had been summoned to the scene and for the public in general. The vehicle was not being operated at a high rate of speed, however, and there were no other officers or members of the public in the area at the time of these events.

Later investigation revealed that Passinault had fired a total of 12 shots at the truck, at least two or three of which struck Murray. The truck eventually came to a stop in a ditch some distance down the road, with Murray slumped over the wheel, dead.

**The Plaintiff's Version of the Facts**

Because Rebecca Rodriguez was an eyewitness to what occurred, the plaintiff was able to offer a significantly different version of events, which must, of course, be viewed

in the light most favorable to her. According to this account of the facts, when Murray started the truck in order to escape from the alley, he accelerated not toward Passinault but rather toward the only exit available to him. Because the officers' patrol car blocked the truck in the alley from behind, "Murray had only one option, which was to drive forward past the position of the Deputies" in order to get away. The plaintiff concedes that Murray's truck went by Passinault at a distance of about eight feet, but asserts that he took this path only because he could not get out of the alley any other way.

Rodriguez testified that she heard Passinault yell at Murray to stop the truck only once, as opposed to the repeated orders that the defendants claim Passinault made. According to Rodriguez, after ordering Murray to stop, Passinault did not wait for a response but immediately fired his weapon. Moreover, the record tends to show that Passinault fired only that first shot before the truck passed him and was moving away, because forensic evidence fails to reflect that even one bullet struck the front of the truck or the windshield. Instead, according to Rodriguez, Passinault fired the remaining shots after the truck had already turned and driven past him. She testified, in fact, that she saw Passinault running after the truck as he continued shooting at it.

The plaintiff also contends that the fatal shot could not have been fired in self-defense because, according to the autopsy report, the shot that killed Murray would also have paralyzed his legs, yet he was able to operate the truck's gas pedal for some distance

after passing Passinault. In addition, the autopsy report indicates that the bullet moved from the back of Murray's body toward the front, indicating that he was shot from behind.

The plaintiff calls into question Passinault's alleged concern for the safety of others. Although Passinault claimed that he continued shooting after the truck had passed him because he believed it was bearing down on his partner, Jenkins indicated that he was not in the truck's path and that he never felt in danger of being struck by the vehicle. The plaintiff also asserts that the officers lacked reason to believe Murray posed an ultimate threat to the general public because, despite the officers' suspicions that he might have committed a crime of some sort, the most serious offense they actually saw him commit was a traffic violation.

Alleging violations of rights guaranteed under the United States Constitution, plaintiff Murray-Ruhl filed suit on behalf of her son's estate under § 1983 and a comparable Michigan statute, MICH. COMP. LAWS § 691.1407 (2007), against defendants Jenkins, Passinault, Shiawassee County, and Shiawassee County Sheriff Jon Wilson, but the latter two parties have been dismissed from the litigation by stipulation. The case below focused on the plaintiff's claim that the officers used deadly force in violation of the Fourth Amendment. Defendants Passinault and Jenkins moved for summary judgment on the basis of qualified immunity, and the district court granted the motion, holding that qualified immunity was appropriate because Passinault acted reasonably when he shot and killed Murray and, alternatively, because the plaintiff failed to identify a clearly established right

that was violated in the course of her son's death. Pursuant to its discretion under 28 U.S.C. § 1367(c)(4), the district court declined to exercise supplemental jurisdiction and dismissed the plaintiff's state law claims. The plaintiff now appeals the district court's order granting summary judgment to the defendants.

## DISCUSSION

### Standard of Review

We review a district court's grant of summary judgment *de novo*. See Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. See Ciminillo, 434 F.3d at 464.

### Qualified Immunity

In reviewing a claim of qualified immunity, we recognize that "government officials performing discretionary functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity entitles a government official "not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability'." Elder v. Holloway, 510 U.S. 510, 514 (1994) (quoting Harlow, 457 U.S. at 806).

In Saucier v. Katz, the Supreme Court established a two-pronged inquiry to determine an official's entitlement to qualified immunity in the context of an excessive force claim. 533 U.S. at 200-01. First, the reviewing court must ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If a constitutional right was violated, "the next, sequential step is to ask whether the right was clearly established." Id. The Court has emphasized the importance of defining the right allegedly violated at the appropriate level of specificity, holding that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense" and that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Thus, qualified immunity is inappropriate if it would be clear to a reasonable officer that his conduct was unlawful.

Central to our disposition in this case, however, is our recognition that if "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," the district court should not grant immunity from a deadly force claim. Brandenburg v. Cureton, 882 F.2d 211, 215-16 (6th Cir. 1989). "[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force." Sova v. City of Mt. Pleasant, 142 F.3d 890, 903 (6th Cir. 1998).

**Did Passinault's Conduct Violate a Constitutional <u>Right</u>?**

In this circuit, we have noted that "[q]ualified immunity in cases involving claims of deadly force is difficult to determine on summary judgment because liability turns upon the Fourth Amendment's reasonableness test." Sova v. City of Mt. Pleasant, 142 F.3d 898, 902 (6th Cir. 1998). Under Tennessee v. Garner, a police officer may use deadly force to prevent escape only "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," 471 U.S. 1, 11 (1985); "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead,'" Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (per curiam) (quoting Garner, 471 U.S. at 11). The Fourth Amendment's reasonableness test is an objective one and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). Hence, we may not substitute our judgment for that of the police officer on the scene but, instead, must make "allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the

amount of force that is necessary in a particular situation." Id. at 397. Accordingly, an officer accused of using deadly force in violation of a suspect's Fourth Amendment rights should not be afforded qualified immunity "if, on an objective basis, it is obvious that no reasonably competent officer would have [shot the victim]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." Sova, 142 F.3d at 903 (alteration in original) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In this case, the plaintiff contends that Passinault's use of deadly force was "constitutionally unreasonable" because Murray did not pose a threat to either the officers or to the general public. The district court disagreed, finding that Passinault's conduct was reasonable and, thus, there was no violation of Murray's Fourth Amendment rights. Under Saucier's two-pronged inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." 533 U.S. at 201. However, the district court also addressed the second prong, holding that the plaintiff had not established that the defendants had violated a clearly established right because she "ha[d] failed to distinguish" cases cited by the court in its opinion and "failed to demonstrate any similar factual scenarios where the Court denied qualified immunity to the defendant police officers." The district court was forced to concede that the "factual scenarios" in the three cited cases were "not identical" to the facts in the instant case, but nevertheless postulated that they were "similar."

Our review of the cases relied upon by the district court reveals, however, that they bear virtually no similarity to the facts in this case. The district court was undoubtedly led

into error in this regard by having summarized the events laid out above in a single sentence, which, far from stating the facts in the light most favorable to the plaintiff, as required, actually summarized them in a light decidedly favorable to the defendants and then concluded, without further analysis, that Passinault's actions were reasonable:

> On the night of September 6, 2003, Deputy Passinault made a split-second decision to use lethal force in order to protect himself and Deputy Jenkins from a truck which was accelerating in his direction, which had violated his order to stop, which came within eight feet of striking Deputy Passinault, and which was escaping from the scene. The Court finds that Deputies Passinault and Jenkins acted reasonably under the circumstances.

Obviously, if Passinault had fired a single shot as the truck came at him – or even as it passed close to him – the district court's findings of fact, as abbreviated as they were, might be subject to deference on appeal. But one fact glaringly obvious from the record is that Passinault emptied his weapon at the vehicle, reloaded it, and fired at Murray perhaps as many as a dozen times even after the truck had passed by him and, thus, after Passinault could reasonably believe that it imposed a threat to himself or – if Deputy Jenkins is to be believed – to his partner. It was one of these "after shots" that proved to be fatal.

At the very least, this record creates a dispute of fact concerning whether events unfolded as the defendants claim in contending that they are entitled to qualified immunity and whether their actions can be said to have been objectively reasonable under those circumstances. Indeed, the reasonableness of the use of deadly force turns entirely on which version of the facts one accepts. According to the officers, Passinault's decision to

shoot at Murray's truck was reasonable because Murray drove his truck directly at Passinault, almost hitting the officer (and in a discredited version, actually hitting Passinault) and refusing to stop despite multiple orders, then raced erratically toward Jenkins, posing a serious threat of danger to that officer. Under the plaintiff's version of the facts, however, no reasonably competent officer would have perceived danger sufficient to justify shooting Murray: Murray was not aiming his truck at Passinault but rather trying to leave the scene; Passinault ordered him to stop only one time, opening fire without waiting for a response; Passinault fired the majority of the bullets only after the truck had already turned away from him; Jenkins was never in danger of being struck; and the officers lacked probable cause to believe that Murray was involved in the commission of an offense or that he posed a threat to anyone. In granting summary judgment to the defendants, the district court simply failed to acknowledge the conflicts in the parties' allegations of fact concerning the reasonableness of Passinault's action in causing Murray's death, instead crediting the defendants' version of the events leading up to Murray's death. In doing so, the district court usurped the jury's function, deciding – in effect – that Passinault continued firing past the need to do so out of fear or concern rather than anger or frustration. The former, it seems to us, would be objectively reasonable if true; the latter would not.

Other Sixth Circuit cases involving police shootings in the context of vehicular flight are helpful in examining whether summary judgment was appropriate based on the Fourth Amendment's objective reasonableness test. In Smith v. Cupp, 430 F.3d 766 (6th Cir.

2005), an officer named Dunn shot and killed an arrestee who had gained control of the officer's patrol car when he left the suspect alone in the vehicle. Id. at 774. We upheld the district court's denial of qualified immunity based in part on our conclusion that the suspect posed no threat of danger to the officer. Although Dunn claimed that he fired at the patrol car in self-defense as the vehicle accelerated toward him, a "reasonable jury could conclude that Dunn did not fire as the vehicle was bearing down on him in fear of his life . . . [but rather] that Dunn fired as he ran toward the driver side of the car after the car passed him." Id. Similarly, based on the plaintiff's version of the disputed facts in this case, a jury could conclude that Passinault could not reasonably have believed that Murray presented a danger to him. Despite the officer's claim to have fired upon Murray's truck in self-defense, the plaintiff's view of the facts and the autopsy report suggest that the majority of the shots, if not all, were fired by the officer after the car had already turned and was driving away.

According to the defendants, Passinault acted reasonably in shooting Murray because the truck constituted a deadly weapon that posed a threat of serious physical harm not only to himself but also to Jenkins, other officers, and the general public. We have acknowledged that "a car can be a deadly weapon." Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992). But, we have also held that "[a]lthough this circuit's previous cases give substantial deference to an officer's decision to shoot a unarmed suspect in a car chase, the officer must have a reason to believe that the car presents an imminent danger." Cupp, 430 F.3d at 775. Comparing the situation in the present case to that of

two cases cited by the district court suggests that Passinault lacked sufficient reason to believe that Murray's truck posed such a threat.

In the first of those two cases, Smith v. Freland, 954 F.2d 343 (6th Cir. 1992), a police officer shot and killed a man after a high-speed chase. At various times during the pursuit, two different officers had attempted to stop the suspect by blocking his car with their patrol cars. Id. at 344. Twice the suspect evaded the officers, narrowly missing a collision with the patrol cars. Id. Ultimately, however, one of the officers managed to blockade the suspect with his patrol car. Id. When the officer exited his vehicle and approached the car, however, the suspect reversed, sped forward and crashed into the officer's patrol car, then reversed again and proceeded to drive around the patrol car. Id. While the suspect's car was zooming past the officer, he fired his gun, killing the driver. Id.

In the second of the two cases relied upon by the district court, Scott v. Clay County, Tennessee, 205 F.3d 867 (6th Cir. 2000), police officers shot at a car involved in a high-speed chase and wounded a passenger. The chase began when the driver displayed erratic driving, including speeding through a stop sign and narrowly avoiding a collision with an unmarked police car. Id. at 871-72. With the police in pursuit, the driver engaged in conduct that "patently risked the physical safety of civilian motorists and pedestrians, pursuing patrolmen, [his] passenger, and himself." Id. at 872. Finally, the driver lost control of his car and crashed into a guard rail. Id. A pursuing officer who then approached the vehicle on foot had to jump out of the way when it suddenly accelerated

toward him. Id. Seeing the vehicle again race toward the public roadway, this officer fired his gun at the car, wounding the passenger. Id. at 872-73.

In both Freland and Scott, we concluded that the officers' actions were reasonable under the Fourth Amendment's objective reasonableness test. As we described their situations in Cupp:

> In both of these cases, there was no question that the lives of the officers, or the lives of both the officers and members of the public in the area, were endangered by the fleeing suspects. Each suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around. The officers reacted with deadly force only after an extended interaction between police and the suspect proved that the suspect was likely to continue to threaten the lives of those around him in his attempt to escape.

430 F.3d at 775. In contrast to Freland and Scott, the plaintiff's version of the facts in the present case presents a situation in which there *is* a question regarding whether the officer could reasonably have believed that anyone's life was endangered by Murray as he attempted to flee in his truck. Here, Passinault did not have a prolonged interaction with Murray in which he demonstrated a willingness to harm an officer or engage in reckless behavior. In fact, examining the plaintiff's statement of the facts, we would have to conclude that Passinault lacked any reason to believe that he would harm anyone in his attempt to drive away from the area. Therefore, based on the plaintiff's version of the facts, a jury could find that no reasonably competent officer would have shot the victim, thus satisfying the first prong in Saucier's two-pronged qualified immunity analysis.

**Was the Right Clearly Established?**

Once it is established that Passinault violated Murray's constitutional rights, the next step in Saucier v. Katz's two-pronged qualified immunity analysis asks whether the constitutional right at issue was clearly established. The purpose of this inquiry is to determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id.

In response to the defendants' motion for qualified immunity, the plaintiff argued that her son's right to be free from excessive force and unreasonable seizure was "clearly established" such that Passinault should have known that continuing to fire needlessly at the truck violated Murray's Fourth Amendment rights. The district court held to the contrary, however, based on its determination that the right asserted by the plaintiff was a "broad general proposition" and thus not particularized enough to put a reasonable officer on notice in the specific factual context of this case.

Although the "clearly established" prong of the Saucier analysis generally requires that the right allegedly violated be defined specifically, the Supreme Court has recognized that "in an obvious case" involving the use of deadly force, the general standards established in Tennessee v. Garner and Graham v. Connor are sufficient to put an officer

- 16 -

on notice that his conduct violates the Fourth Amendment.  See Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (*per curiam*) ("in an obvious case, these standards can 'clearly establish' the answer even without a body of relevant case law").  According to the defendants, however, this is not "an obvious case" in which Garner and Graham provide a "clearly established" right.  Rather, they argue, Brosseau requires us to hold that the officers in this situation did not violate a clearly established right.

In Brosseau, the Court examined various cases involving police shootings in the context of vehicular flight and concluded that these cases "by no means 'clearly establish' that [the officer's] conduct violated the Fourth Amendment."  543 U.S. at 201.  Although at first blush, Brosseau seems to be on point, the Sixth Circuit recently distinguished that holding in a case with facts similar to the present case.  In Smith v. Cupp, we held that "Brosseau v. Haugen does not preclude this court from finding the right at issue was clearly established because the Brosseau Court said that undisputed facts showed that the shooting officer believed the suspect had a gun and was fearful for officers in the immediate area."  430 F.3d 766, 776 (6th Cir. 2005).  In contrast to the dangerous situation in Brosseau, in Cupp we found that there was "no comparable evidence that [the officer] had cause to believe that [the suspect] posed an immediate risk of death or serious danger" and therefore concluded that "Garner, by itself, clearly establishes the right at issue."  Id.

Similarly, under the plaintiff's version of the facts, a reasonable jury could conclude that Murray posed no danger to the officers or the general public.  When the suspect poses

no immediate risk of death or serious danger, <u>Brosseau</u> does not control and <u>Tennessee v. Garner</u> provides a "clearly established" right that fulfills the second prong of the qualified immunity analysis.

**Did Jenkins's Conduct Violate a Constitutional Right?**

Under well-established Sixth Circuit precedent, a police officer may be responsible for another officer's use of excessive force if the officer "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997). Obviously, neither of the first two categories applies to Jenkins, but the third is potentially applicable. In Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982), for example, we held that police officers who stood by and did nothing while the plaintiff was beaten by other officers could be held liable under § 1983. See also Durham v. Nu'Man, 97 F.3d 862, 866-68 (6th Cir. 1996) (holding that qualified immunity was improper for a security officer and a nurse who witnessed the beating of a shackled patient but did not try to stop it). In general,

> a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

Turner, 119 F.3d at 429.

Because the facts here establish that Jenkins lacked sufficient time to act to prevent Passinault's use of excessive force, summary judgment was appropriate. Passinault fired twelve shots in rapid succession at Murray's truck. Even if Jenkins was immediately able to perceive what was happening once the first shot was fired, he would not have had enough time to act to stop Passinault from shooting. In at least one unpublished opinion, the Sixth Circuit has found no duty to intervene where, as here, "an entire incident unfolds 'in a matter of seconds.'" Ontha v. Rutherford County, Tenn., 222 Fed. Appx. 498, 506 (6th Cir. 2007). See also Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990) ("A police officer cannot be held liable for failing to intercede if he has no 'realistic opportunity' to prevent an attack"); O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988) ("This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"). Additionally, the conclusion that summary judgment is proper for Jenkins is reinforced by the plaintiff's lack of strenuous effort to maintain her claims against this defendant.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court in favor of Jenkins, REVERSE the judgment of the district court in favor of Passinault, and REMAND the case for further proceedings with respect to Passinault.

**BOGGS, Chief Judge, concurring in the judgment.**  Although I agree that there are triable issues of fact material to the question of Officer Passinault's qualified immunity, and thus that the district court erred in granting summary judgment to him on this basis, I write separately because I consider the range of *material* disputes to be considerably narrower than does the majority.  I fully agree with the majority's analysis of Officer Jenkins's qualified immunity.

I

The court's opinion appears to concede that, at most, Officer Passinault might have been entitled to qualified immunity if he "had fired a single shot as [Murray's] truck came at him."  Maj. Op. at 11.  It concludes, however, that his subsequent shots can only be evaluated for reasonableness after answering the (disputed) factual question whether he, his partner, or the general public were in fact in danger.  But this question is, as a matter of law, immaterial to the qualified immunity analysis:  we look not to whether, in retrospect, Murray presented an *actual* danger, but whether, in the context of unfolding events, Officer Passinault could have *reasonably perceived* a danger.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  In this light, the factual disputes concerning, e.g., what Murray's intentions were when he started his truck in the direction of the officers; how many times Passinault ordered Murray to stop; and whether Officer Jenkins was in fact in the direct path of the truck and in danger of being struck, are all irrelevant.

- 20 -

There is no dispute, as the court acknowledges, Maj. Op. at 5, that Murray's truck passed within eight feet of Passinault, in a confined space. However, there is also undisputed forensic evidence of tire marks on the scene, which, according to the state police crash reconstruction, "indicated that the vehicle was being rapidly accelerated as it entered the parking lot from the grass area. The tire marks showed distinct evidence that the rear tires were spinning because of heavy acceleration. The acceleration continued for approximately 35' where the vehicle began to lose control as it rotated in a counter clockwise direction." JA 111-12. Whatever the actual danger Murray presented, the court's assertion that "the officers lacked probable cause to believe that Murray . . . posed a threat to anyone," Maj. Op. at 12, is inconsistent with the undisputed fact that, while approaching Passinault within eight feet, Murray was accelerating enough to cause his tires to spin and to lose control of his truck.[2] And there appears to be no dispute that Officer

---

[2]The court states that the "record fails to establish the officer's precise location when the truck left tire marks on the pavement," and that "it is possible, based on the evidence in the record, that the truck did not begin to lose control and rotate until Murray turned the wheel in order to avoid hitting Passinault." (Maj. Op. at 3 n.1). The relevance of the first statement appears to be belied by the record: the forensic report, which Murray-Ruhl offers no basis to doubt, indicates that, as quoted above, Murray's truck's tires were spinning, and that the truck "rotated"–not swerved–in a counterclockwise direction when it was near Passinault. After momentarily straightening out, it "started to yaw in a clockwise direction." The conclusion that Murray was out of control in close proximity to Passinault does not depend in any way on knowing the latter's *precise* location, given that his general location–in a relatively bounded area–is undisputed.

The Supreme Court has recently reminded us that, in the context of summary judgment, not all factual disputes–even material ones–are "genuine," where a bare assertion by the non-moving party is "so utterly discredited by the record that no reasonable jury could have believed him." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). Thus, however many times Murray-Ruhl asserts as a fact that there was no basis for Passinault to be in fear of serious injury, the record indicates unambiguously that Murray's truck passed within eight feet of Passinault (at a point where

Jenkins was further along the general path of Murray's truck: again, regardless of whether the truck would have actually struck Jenkins and whether Jenkins at the time perceived a likelihood of danger to himself, we cannot say that no reasonable officer in Passinault's circumstances could make the split-second judgment that a nearby fellow officer was in danger of serious injury.

The court emphasizes Murray-Ruhl's allegation that Passinault did not *in fact* fear for his own safety or that of Jenkins. Maj. Op. at 11, 12. Again, though this may be a factual matter in dispute, it is not material to the question of qualified immunity, which is concerned only with the objective reasonableness of the officer's actions, and not with his subjective state of mind. *See Harlow v. Fitzgerald*, 457 U.S. at 817-18 ("[B]are allegations of malice should not suffice" to overcome qualified immunity where the officer's actions were objectively reasonable.); *Smith v. Cupp*, 430 F.3d 766, 771 n.1 (6th Cir. 2005) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force.") (citing *United States v. Robinson*, 414 U.S. 218, 235-36 (1976)).

---

Passinault's retreat was blocked by the pole barn), that it was being accelerated rapidly enough to cause its tires to spin, and that it was fishtailing. Murray-Ruhl does not dispute with any specificity the validity of these forensic findings. And under those conditions–a car at least partially out of control, heading in his direction, coming within eight feet–it was objectively reasonable for Passinault to fear for his safety.

The second assertion is, as discussed below, simply irrelevant to the qualified immunity analysis. Murray's actual intentions are not the object of our inquiry: even if we credit the unsupported supposition that Murray was in fact virtuously attempting to *avoid* the officer, the only relevant question is whether a reasonable officer under the circumstances could have perceived a likelihood of serious injury.

Similarly, the court appears to conclude that Murray-Ruhl's assertion that Murray traveled toward the officers because, with his truck being otherwise blocked in, it was his only option, constitutes a *material* dispute of fact. Maj. Op. at 13. On the contrary, in addition to being wrong as a matter of logic (surely Murray had the option of staying put or submitting to the officers), the subjective intent of the victim–unavailable to the officers who must make a split-second judgment–is irrelevant to the question whether his actions gave rise to a reasonable perception of danger.

Murray-Ruhl's assertions that Murray did not in fact endanger the officers or anyone else, and that Passinault did not in fact believe he or Jenkins were in danger, are not disputes material to the question of qualified immunity. If they were, any plaintiff in an excessive use of force claim could defeat summary judgment on qualified immunity grounds simply by asserting as a fact that the defendant did not have a requisite reasonable state of mind, or that the victim, in hindsight, did not in fact present a danger. On the contrary, the question of qualified immunity is a question of law that depends only on objective reasonableness, not on actual danger or subjective state of mind. *See Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004). Accordingly, Passinault's use of force while Murray was approaching him and was moving in the vicinity of where Officer Jenkins was plausibly located should be protected by qualified immunity.

There do, however, remain *material* disputes of fact. The plaintiff asserts that the shot that killed Murray was fired well after his truck had passed both Passinault and Jenkins, when the truck was turning onto a public road. At this point in the unfolding

events, Passinault presumably could not have had a reasonable belief that he or Jenkins continued to be in danger, and his claim of qualified immunity hinges on whether a reasonable officer under the circumstances would have perceived Murray as a likely danger to members of the public or other officers who might be arriving on the scene. Although our cases have affirmed grants of qualified immunity on this basis, even after the danger to the officers themselves had passed, the reasonableness in such a context depends on whether the behavior of the victim had been egregious enough to support a reasonable belief that he constituted a continued threat to others.

Thus, in *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), the victim, by engaging in a high-speed chase and crashing his vehicle into a police patrol car, had shown himself dangerous enough to support such a reasonable belief. In *Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000), the fleeing victim had patently expressed a willingness to endanger bystanders as well as police, and after crashing into a guard rail was heading toward a highway when the officer used deadly force. *Id.* At 872-73. And in *Brosseau v. Haugen*, 543 U.S. 194 (2004), the Supreme Court upheld a grant of qualified immunity for an officer who shot a suspect who had been involved in a fight, fled to a Jeep when the officer attempted to intervene, and, despite the officer's attempt to reach into the vehicle to secure the keys, was able to start the engine and begin moving forward. Although the officer was to the side of the vehicle and thus not herself in any danger, there was reason to believe the victim had a gun in the vehicle, and she claimed to be "fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [the

victim's] path and for any other citizens who might be in the area." *Id.* at 197 (internal quotation marks and citations omitted).

On the other hand, we have refused to find qualified immunity in somewhat analogous situations, but where the actions of the victim did not give rise to a reasonable belief that his flight presented a risk of harm to others in the area. In *Smith v. Cupp*, the victim had been arrested for making harassing telephone calls, and was in the back of the officer's running patrol car while the officer spoke with a wrecker driver who had arrived to impound the victim's car. The victim used this opportunity to move to the driver's seat of the patrol car and attempt to flee. We observed that, whereas in *Freland* and *Scott* the victims had clearly displayed their willingness to endanger the lives of bystanders during an extended interaction with the police, the victim in that case had not indisputably done so, precluding qualified immunity on summary judgment.

The facts in this case to fall into the area between *Cupp* on the one hand and *Freland*, *Scott*, and *Brosseau* on the other. While Murray does not appear, on anyone's version of the facts, to have been as clear a danger as the victims in the latter cases (or at least *Freland* and *Scott*), neither does he appear to have been as unthreatening as the victim in *Cupp*, insofar as Murray's actions did, at the very least, give rise to a reasonable fear that he was a danger to the lives of the officers on the scene, something the victim in *Cupp* never did. Thus, the question whether Passinault was reasonable in continuing to fire on Murray's truck out of fear for the safety of others in the area depends largely on whether Murray's behavior up to that point gave rise to a reasonable belief that he

presented the requisite level of danger. This, in turn, depends on the answers to a number of factual questions in dispute, such as how fast, and how recklessly, Murray had been traveling, both when he was in the vicinity of the officers and when he had passed them and was heading into the public roadway; how much time had elapsed between his endangerment of the officers and his entry into the public roadway; and what basis, if any, might have supported a belief that others were likely to be in the path of danger.[3]

In sum, though I agree with the courts's reversal of summary judgement in favor of Officer Passinault, I would hold that the material factual disputes necessary to resolve the question of his qualified immunity are considerably narrower than suggested by the opinion, and, in particular, questions about the actual danger Murray posed, or the state of mind of Officer Passinault and Murray himself, are irrelevant to its resolution.

---

[3]The court, in its discussion of *Freland*, *Scott*, and *Cupp*, suggests that in this case "there *is* a question regarding whether anyone's life was endangered by Murray as he attempted to flee in his truck." Maj. Op. at 15. Again, this is misdirected: the question is not whether anyone was *in fact* endangered, but whether an officer in Passinault's shoes could have *reasonably perceived* such endangerment.