RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DENISE WALKER, as Administratrix of the
Estate of Thomas Brian Germany, Deceased,
and Next Friend of T.A.G., a minor,

        *Plaintiff-Appellee,*

    *v.*

DANNY DAVIS, Allen County Deputy Sheriff,
in his Individual Capacity; SAM CARTER,
Allen County Sheriff, in his Individual and
Official Capacities,

        *Defendants-Appellants.*

No. 09-5949

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 09-00006—Joseph H. McKinley, Jr., District Judge.

Argued: March 10, 2011

Decided and Filed: August 22, 2011

Before: KEITH, McKEAGUE, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charles E. English, Jr., ENGLISH, LUCAS, PRIEST & OWSLEY, LLP,
Bowling Green, Kentucky, for Appellants. Trevor W. Wells, MILLER WELLS PLLC,
Lexington, Kentucky, for Appellee. **ON BRIEF:** Charles E. English, Jr., ENGLISH,
LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for Appellants. Ross
T. Turner, Madisonville, Kentucky, for Appellee.

    KETHLEDGE, J., delivered the opinion of the court, in which KEITH, J., joined.
McKEAGUE, J. (pp. 4–14), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  The facts of this case, as we are required to view them on appeal, are that Thomas Germany was killed while riding a motorcycle across an empty field, in the middle of the night, after a low-speed chase, when Deputy Sheriff Danny Davis intentionally rammed the motorcycle that he was riding.  The district court held that Davis's actions, so viewed, violated Germany's clearly established constitutional rights, thereby precluding qualified immunity for Davis.  We affirm.

We take the district court's view of the facts in the light most favorable to Germany's Estate.  *See Hayden v. Green*, 640 F.3d 150, 152 (6th Cir. 2011).  Shortly after midnight in rural Kentucky, a police officer clocked Germany riding his motorcycle at 70 miles per hour in a 55 miles per hour zone.  That officer (who is not a defendant here) tried to pull over Germany for speeding, but Germany refused to stop.  Deputy Davis then heard about the pursuit over the radio.  As Germany approached Davis's location, Davis blocked the road with his cruiser.  Germany maneuvered around him cleanly.  Davis then gave chase.  The entire pursuit lasted about five minutes and took place on empty stretches of highway.  Germany never went above 60 miles per hour during the chase itself.  He ran one red light.

Germany eventually turned off the road and cut across a muddy field.  Davis followed close behind in his cruiser.  According to the Estate's reconstruction expert—who analyzed, among other things, the location of paint transfers between the two vehicles—Davis then intentionally rammed Germany's motorcycle.  Germany was thrown from the motorcycle and dragged underneath the cruiser, crushing him to death.

Denise Walker brought this 42 U.S.C. § 1983 suit on behalf of Germany's estate and minor son, claiming that Davis's use of force against Germany violated the Fourth Amendment.  Davis moved for summary judgment on the basis of qualified immunity.  The district court denied the motion.  This appeal followed.

We review the court's denial of qualified immunity de novo. *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008). Our jurisdiction is limited to the question whether the evidence, considered in the light most favorable to the Estate, shows a violation of a clearly established constitutional right. *See id.* at 517.

It has been settled law for a generation that, under the Fourth Amendment, "[w]here a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Here, Germany posed no immediate threat to anyone as he rode his motorcycle across an empty field in the middle of the night in rural Kentucky. That fact, among others, renders this case patently distinguishable from *Scott v. Harris*, 550 U.S. 372 (2007), in which Harris had led the police on a "Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380. The chase here was a sleeper by comparison.

Nor does it matter that, at the time of Davis's actions, there were few, if any, reported cases in which police cruisers intentionally rammed motorcycles. It is only common sense—and obviously so—that intentionally ramming a motorcycle with a police cruiser involves the application of potentially deadly force. This case is thus governed by the rule that "general statements of the law are capable of giving clear and fair warning to officers even where the very action in question has not previously been held unlawful." *Smith v. Cupp*, 430 F.3d 766, 776-77 (6th Cir. 2005) (internal marks omitted).

Whether, in fact, the collision here was intentional is for a jury to decide. Davis insists it was not. But the facts, as we must view them, make out a violation of Germany's clearly established constitutional rights. The district court's denial of qualified immunity is affirmed.

––––––––––––––––

**DISSENT**

––––––––––––––––

McKEAGUE, Circuit Judge, dissenting.  I respectfully dissent because I think that the majority has significantly downplayed the level of risk that Germany posed to the public, and defined clearly-established law at too high a level of generality.  Because I do not believe that Davis's alleged conduct was prohibited by clearly-established law, I would find that Davis is entitled to qualified immunity.

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine acknowledges "that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts," thus, if the officer makes a reasonable mistake as to what the law requires, the officer is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  Ultimately, it is the plaintiff's burden to prove that the officer is not protected by the doctrine. *See Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

To determine if an officer is entitled to qualified immunity, the Supreme Court has established a two-prong test.  First, the reviewing court "must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 201).  Second, the court "must decide if the right at issue was clearly established at the time of the defendant's alleged misconduct." *Id*. (internal quotation marks omitted).  For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In other words, pre-existing law must "dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion

for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (emphasis in original) (citation and internal quotation marks omitted); *see also Akers v. McGinnis*, 352 F.3d 1030, 1042 (6th Cir. 2003) (noting that the right must be "so clearly established when the acts were committed that *any* officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct"). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. Pursuant to *Pearson*, "the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236.

As the Supreme Court explained in *Scott*, before diving into the law, it is necessary "to determine the relevant facts." 550 U.S. at 378. At the summary judgment stage, the relevant facts are the plaintiff's version of the facts, as well as those facts that are undisputed, viewed in the light most favorable to the plaintiff. *See id.* at 380 (noting that the plaintiff's version of the facts is accepted only when there is a "genuine" dispute as to those facts).

Here, Officer Tabor was patrolling an apartment complex in Scottsville, Kentucky when he noticed Germany traveling 15 miles per hour over the speed limit on a four-lane highway. Tabor attempted to stop Germany by activating his lights and sirens, but Germany refused, and continued to drive away. As Tabor pursued Germany, Davis joined the chase from the opposite direction, and positioned his police car in Germany's path in another attempt to stop him. Instead of stopping, Germany swerved into the lane for oncoming traffic, and went around Davis's car. Shortly thereafter, Germany sped through a red light at a four-way intersection. Tabor then stopped in the intersection to clear traffic, for the officers' safety, and the safety of other possible motorists, which allowed Davis to take over lead of the pursuit. On at least two

occasions, Germany slowed down "and then all of a sudden . . . [took] off again . . . at an erratic rate of speed." Still, Germany's speed during the pursuit never exceeded more than 60 miles per hour, and Tabor testified that he never saw another vehicle. However, Tabor also testified that he thought that the absence of other vehicles was unusual. Germany then went approximately 263 feet into the muddy field when Davis is alleged to have intentionally rammed his motorcycle. The entire pursuit—from the apartment complex to the field—lasted approximately five minutes, and covered approximately ten miles. Before Germany was struck by Davis, there was no indication that Germany intended to obey the officers, and cease fleeing. After the fact, it was discovered that Germany was intoxicated at the time of the pursuit.

Unlike the majority, I find that the second prong of the test is dispositive, and qualified immunity is appropriate here because the law did not put Davis on notice that ramming into Germany's car was clearly unlawful. I begin by noting that there are two problems with the majority's contention that the general proposition of *Garner*—"[w]here a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so"—provided clear guidance and fair warning to Davis that his alleged conduct was unlawful.

First, the Supreme Court has explained that the inquiry into whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. *See also Anderson*, 483 U.S. at 640 ("It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense."). Thus, in *Brosseau v. Haugen*, 543 U.S. 194 (2004), the Court cautioned against using *Garner* (and *Graham v. Connor*, 490 U.S. 386 (1989)) for the proposition that it was clearly established that an officer was violating the plaintiff's constitutional rights. *Id*. at 198–99. *Garner* and *Graham* "are cast at a high level of generality," and they do little more than "'follow[] the lead of the Fourth Amendment's text" to establish that the "'use

of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.'" *Id*. at 198–99 (quoting *Saucier*, 533 U.S. at 202). Indeed, as recently as this past term, the Supreme Court noted that they "have repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (internal citations omitted). It is only in the "obvious case" that *Garner* "can 'clearly establish' the answer, even without a body of relevant case law." *Brousseau*, 543 U.S. at 199; *cf. Smith v. Cupp*, 430 F.3d 766, 777 (6th Cir. 2005) ("*Garner* and *Graham* clearly establish that a suspect fleeing in a car that has *never* posed a danger to *anyone* has the clearly established right not to be seized with deadly force.") (emphasis added).

Second, in *Scott*, the Supreme Court rejected the use of *Garner* in the context of a car chase. As the Court explained, "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test . . . [holding] that it was unreasonable to kill a 'young, slight, and unarmed' burglary suspect by shooting him 'in the back of the head' while he was running away on foot, and when the officer 'could not reasonably have believed that [the suspect] . . . posed any threat.'" *Scott*, 550 U.S. at 382–83 (quoting *Garner*, 471 U.S. at 4) (internal citations omitted). Thus, the Court found that *Garner* has "scant applicability to this case, which has vastly different facts," and "'nothing to do with one car striking another or even with car chases in general. . . . A police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person.'" *Id*. at 383 (quoting *Adams v. St. Lucie Cnty. Sheriff's Dept.*, 962 F.2d 1563, 1577 (11th Cir. 1992) (Edmondson, J., dissenting)); *see also Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 580 (5th Cir. 2009) (noting that the Supreme Court in *Scott* "determine[d] that *Garner* could not establish a clear Fourth Amendment rule governing car chases because that case involved a suspect fleeing on foot").

Like *Scott*, this case involves neither a police shooting nor a foot chase, and is vastly different from the facts in *Garner*. I believe that *Brosseau* and *Scott* demonstrate

that the broad language of *Garner* is inapplicable to our task of determining whether it was clearly established that Davis's conduct was unlawful. Moreover, the majority's seemingly straightforward use of *Garner* to dispose of this case ignores the Court's admonition that "we must still slosh our way through the factbound morass of 'reasonableness,'" *Scott*, 550 U.S. at 383, in these police chase qualified immunity cases, because the inquiry into whether it was clearly established that an officer's conduct violated the Fourth Amendment "depends very much on the facts of each case," *Brousseau*, 543 U.S. at 201. Instead, I find that it is more appropriate to look to cases involving suspects fleeing in vehicles, and a decision by a police officer to bump the suspect's vehicle in order to terminate the chase, to assist in our inquiry into "'whether the right was clearly established . . . in light of the specific context of the case.'" *Scott*, 550 U.S. at 377 (quoting *Sacuier*, 533 U.S. at 201).

*Scott* represents the Supreme Court's clearly-established law on this subject. The Court characterized the question presented in that case as follows:

> We consider whether a law enforcement official can, consistent with the Fourth Amendment, attempt to stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist's car from behind. Put another way: Can an officer take actions that place a fleeing motorist at risk of a serious injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders?

*Scott*, 550 U.S. at 374. It is true, as the majority correctly notes, the motorist in *Scott* led the police on a "Hollywood-style car chase of the most frightening sort" that obviously posed a threat to the lives of others. The suspect swerved "around more than a dozen other cars, cross[ed] the double-yellow line, and force[d] cars traveling in both directions to their respective shoulders to avoid being hit." *Id*. at 379. Based on those facts, the Court found that "[t]he car chase that the respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise." *Id*. at 386. Unlike *Garner*, the Court noted, "it was respondent's flight itself (by means of a speeding automobile) that posed the threat of 'serious physical harm . . . to others.'" *Id*. at 382 n.9 (quoting *Garner*, 471 U.S. at 11); *see also id*. at 384 (noting that it is appropriate to take into account the relative

culpability of the plaintiff where he has ignored the police officers' warnings to stop and engaged in reckless flight). Moreover, it made no difference to the Court that "when [the officer] rammed [the suspect's] vehicle it was not threatening any other vehicles or pedestrians" because "[u]ndoubtedly [the officer] *waited* for the road to be clear before executing his maneuver." *Id*. at 380 n.7 (emphasis in original). Thus, the Court answered the question presented in the affirmative, leaving us with this rule: "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Id.* at 386.

Since *Scott*, our Court has not had the opportunity to consider qualified immunity in the context of an officer ramming a vehicle to end a chase. A few of our sister circuits have. In *Pasco ex rel Pasco v. Knoblauch*, the Fifth Circuit held that it was objectively reasonable for an officer to terminate a police chase by bumping the car during the course of a high-speed chase "on a curvy two-lane road in a residential area at approximately 3:00 in the morning," when the officer believed the suspect might have been driving while intoxicated, despite the fact that the officer conceded that "no other vehicles, pedestrians, or other bystanders were encountered during the pursuit," and that the officer conceded that the suspect may have decelerated at the end of the chase. 566 F.3d at 579. The Fifth Circuit noted that although "the specific facts of every chase will be different, the [*Scott*] Court acknowledged the generally inherent danger that suspects fleeing from police in vehicles pose to the public." *Id*. at 580. Moreover, the court found that "the holding of *Scott* was not dependent on the actual existence of a bystander—rather, the Court was also concerned about the safety of those who could have been harmed if the chase continued," because the *Scott* Court acknowledged that the suspect was not threatening anyone at the moment the officer rammed his car. *Id*. at 580–81 (citing *Scott*, 550 U.S. at 380 n.7). Likewise, the court held that the "early morning hours, the rural nature of the area, and the fact that [the suspect] may have slowed down before impact do not render [the officer's] actions unreasonable" because "the undisputed facts indicate that [the suspect] would have posed a serious threat to anyone he encountered," and the officer "had no way of knowing if another vehicle

would enter [the suspect's] path or whether a person might have been walking around the next corner." *Id*. at 581.

In *Abney v. Coe*, the Fourth Circuit considered whether an officer who was alleged to have intentionally rammed a motorcyclist during a pursuit, resulting in the suspect's death, was entitled to qualified immunity. 493 F.3d 412 (4th Cir. 2007). The defendant-officer observed the motorcyclist cross double-yellow lines to pass a vehicle, and activated his lights and sirens in an attempt to pull him over. *Id*. at 414. A pursuit ensued, and the suspect "illegally passed vehicles by crossing double yellow lines on no less than five occasions . . . running two stop signs . . . and refus[ing] to pull over" even when a police cruiser was placed "directly in front of the motorcycle." *Id*. at 417. Throughout the chase, the traffic on the road was fairly heavy, but the suspect never exceeded the speed limit. *Id*. at 414. The Fourth Circuit held that the officer's actions were "eminently reasonable" because the motorcyclist's "behavior put other motorists at substantial risk of serious harm." *Id*. at 417. In doing so, the court noted that the fact that the motorcyclist did not reach high speeds was "not dispositive," and the fact that the suspect "was driving a motorcycle, rather than a car, does not require a different result [than from *Scott*] since the probability that the motorist will be harmed [by the ramming] is high in either circumstance." *Id*. at 418.

In *Sharp v. Fisher*, the Eleventh Circuit also relied on *Scott*, and found that a police officer's attempt to terminate a chase by ramming the suspect's car was objectively reasonable. 532 F.3d 1180, 1184 (11th Cir. 2008). In that case, the suspect was fleeing at a "high rate of speed . . . [for] at least 20 miles . . . fail[ing] to respond to blue lights and sirens and [giving] no indication of stopping the pursuit or slowing down . . . and . . . driving erratically" when there were other motorists on the highway. *Id*. 1184. Despite the fact that the officer's observation of the driver erratically changing lanes was "for only a short period of time," *id*. at 1182, and without indication that the suspect had narrowly missed or hit another motorist, the court held that ramming the car to end the chase was objectively reasonable, *id*. at 1184.

At the other end of the spectrum are cases like *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008) and *Murray-Ruhl v. Passinault*, 246 F. App'x 338 (6th Cir. 2007), where we considered qualified immunity in the context of officers *shooting* at a fleeing motorist. In *Kirby*, the suspect was pulled over by police, but then attempted to flee using his car during the traffic stop. In the course of doing so, he was shot multiple times by the officers on the scene, and died. 530 F.3d at 479–80. We found that under the plaintiff's facts, the suspect "was moving slowly and in a non-aggressive manner, could not have hit any of the officers, and was stationary at the time of the shooting." *Id*. at 482. Because "no one was *ever* in danger" under these facts, we concluded that "a jury could conclude that reasonable officers would not have perceived an immediate threat." *Id*. at 482–83 (emphasis added). Then, we held that "[a]t the time of the shooting, it was clearly established under . . . *Garner* . . . that police officers may not fire at non-dangerous fleeing felons such as [the suspect]." *Id*. at 483. Similarly, in *Murray-Ruhl*, the officers were approaching the suspect's stopped vehicle, and under the plaintiff's version of the facts, the suspect simply tried to drive away from the officers, never pointing the vehicle at anyone, or having an opportunity to respond to an order to stop, when an officer fired multiple shots on the suspect. 246 F. App'x at 344. Thus, we held that because the officer "did not have a prolonged interaction with [the suspect] in which he demonstrated a willingness to harm an officer or engage in reckless behavior . . . a jury could find that no reasonably competent officer would have shot the victim." *Id.* at 346. Likewise, we held that the right at issue was clearly established under *Garner* because the facts presented "an obvious case involving the use of deadly force" in which "a reasonable jury could conclude that [the suspect] posed *no* danger to the officers or general public." *Id*. at 347 (emphasis added) (internal quotation marks and citations omitted). In short, these two cases show that the law is clearly established that an officer cannot shoot at a fleeing motorist who has *never* posed a risk of danger to others.

While the instant chase might not have been as dramatic as the chase in *Scott*, the majority ignores the fact that the Germany's decision to flee from the officers still endangered the public. As the Supreme Court recently explained in a different context, the act of fleeing from the police in a vehicle alone is extremely dangerous:

> Confrontation with police is the expected result of vehicle flight. It places property and persons at serious risk of injury.
>
> Risk of violence is inherent to vehicle flight. Between the confrontations that initiate and terminate the incident, the intervening pursuit creates high risks of crashes . . . It is well known that when offenders use motor vehicles as their means of escape they create serious potential risks of physical injury to others . . . As that pursuit continues, the risk of accident accumulates.

*Sykes v. United States*, 131 S. Ct. 2267, 2274 (2011) (noting also that between 18% and 41% of all chases involve crashes, and that chase related crashes kill more than *100 nonsuspects* every year).

Indeed, many elements of this particular chase demonstrate the inherent danger in fleeing from the police: It is undisputed that Germany was traveling over the speed limit, that he went through a red light "at a high rate of speed," and that Germany went into the other lane of traffic to avoid Davis's police car. Any one of these decisions, particularly speeding through a red light, is a reckless act that could have easily caused the death of another motorist. Moreover, Germany's intoxication, although not suspected by the officers, "confirms . . . the nature and risk to others posed by [Germany's] conduct," and Germany's indifference. *See Abney*, 493 F.3d at 417. It makes little difference that no other vehicles were present during the chase, because these actions indicate that Germany would have posed a substantial risk to any motorist that he encountered, and because Davis had no way of knowing if there would be a motorist at the next stop light, or around the next corner, had the chase continued. *See Pasco*, 566 F.3d at 581. Indeed, considering that the undisputed record shows that the pursuit began on a four-lane highway near an apartment complex, that another officer felt the need to clear traffic at the traffic signal, and that the officer thought the absence of traffic was unusual, it is logical to conclude that the pursuit would eventually encounter other motorists. This is especially the case because the chase had already covered approximately 10 miles, and all indications were that Germany desired to escape by any means possible, whether by running through red lights, or trying to lose the officers in a field. Nor do I think it matters that the collision occurred in a field, because

Germany was only in the field for a short time, and Germany was likely using the field to  out-maneuver Davis, and continue fleeing on the highway.[1]  In short, this was one of those situations in which "police officers are often force to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Graham*, 490 U.S. at 397.

Like the majority, I express no opinion on whether Davis violated Germany's constitutional rights.  Instead, I only consider whether it was clearly established that Davis "[could not], consistent with the Fourth Amendment, stop a fleeing motorist from continuing his public-endangering flight by ramming the motorist's [vehicle] from behind." *Scott*, 550 U.S. at 374.  If Germany had *never* posed a threat to *anyone*, this case would likely fall in line with *Kirby* and *Murray-Ruhl*, and I would join the majority in finding that Davis's conduct was clearly prohibited by *Garner*.  Instead, this case is one in which "the risk to potential third parties was as substantial, but less imminent, as in *Scott*," *Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir. 2009), and the level of force used was less certain to cause the death of the suspect as in *Kirby*, *see Scott*, 550 U.S. at 383–84 (noting that ramming a motorists car is different than shooting a motorist because it poses "a high likelihood of serious injury or death" rather than "near *certainty* of death"); *see also Cordova*, 569 F.3d at 1189 (explaining that *Scott* makes clear that there is a meaningful "spectrum of deadly force").  I find that this case is much closer to *Scott*, *Pasco, Abney* and *Sharp*—all cases in which the court concluded that the officer's decision to ram the vehicle was objectively reasonable, than it is to *Kirby* or *Garner*.  In any event, "[w]hether [this] situation is more like the police using deadly force (but not of a level certain to cause death) to prevent a substantial risk of harm to others, or more like the police shooting a suspect who poses minimal risk of harm to others is not immediately clear." *Cordova*, 569 F.3d at 1193.  At the very least, Davis "was confronted with a situation that fell between these two lines of cases, and the result was uncertain." *Id.*  Indeed, none of these cases, including *Scott*, "truly compel" the conclusion that a reasonable officer in Davis's situation would have to wait until the

---

[1]Indeed, it would have been safer to terminate the chase in the field where there was no possibility of harming other motorists.  *See Harris*, 550 U.S. at 380 n.7.

fleeing suspect narrowly misses or collides with another motorist, before deciding to ram the suspect's vehicle. *See Gragg*, 289 F.3d at 964. The standards governing this claim "depend[ ] very much on the facts of each case," *Brousseau*, 543 U.S. at 201, and as then-Judge McConnell explained in a case involving the shooting of a fleeing motorist, "the law . . . has been vague on whether the *potential* risk to *unknown* third parties is sufficient to justify the use of force nearly certain to cause death." *Cordova*, 569 F.3d at 1193 (emphasis added).

Because no one "has identified a single case predating the conduct at issue that prohibits [ramming a car] in a materially similar context," and because I believe that these cases demonstrate that Davis's actions "at best fell in the hazy border between excessive and acceptable force," the Plaintiff has failed to show that Davis's conduct was prohibited by clearly-established law. *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (internal quotation marks and citations omitted); *see also Cordova*, 569 F.3d at 1193 (holding that because the law in this area is unclear, an officer who shot a fleeing motorist "was not unreasonable in believing that a *potential* threat to third parties would justify" shooting the motorist) (emphasis added). Accordingly, I respectfully dissent.