*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0076p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

REBECCA RODRIGUEZ,

　　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

THOMAS PASSINAULT,

　　　　　　　　*Defendant-Appellee.*

No. 09-1949

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-14537—Lawrence P. Zatkoff, District Judge.

Argued: July 29, 2010

Decided and Filed: March 25, 2011

Before: GILMAN and WHITE, Circuit Judges; WATSON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Hugh M. Davis, Jr., CONSTITUTIONAL LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellant. Gail P. Massad, CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee. **ON BRIEF:** Hugh M. Davis, Jr., CONSTITUTIONAL LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellant. Gail P. Massad, CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellee.

_____

## OPINION

_____

　　　HELENE N. WHITE, Circuit Judge. Plaintiff Rebecca Rodriguez (Rodriguez) appeals the district court's grant of summary judgment to Shiawassee County Sheriff's

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

Deputy Thomas Passinault (Passinault) in this 42 U.S.C. § 1983 action alleging excessive force under the Fourth and Fourteenth Amendments.  We **REVERSE** the district court's determinations that no seizure occurred and that Passinault is entitled to qualified immunity, and **REMAND** for further proceedings consistent with this opinion.

**I**.

The district court summarized the facts:

> This case arises out of a tragic incident involving the fatal shooting of Michael Murray ("Murray") by Defendant, a Shiawassee County deputy officer.  On  the night of September 5, 2003, after attending a party, Murray and Plaintiff were dropped off at Murray's truck, which was parked at a local bar.  Murray had offered to drive Plaintiff home.  While exiting the parking area, Murray spotted a police cruiser.  Having consumed alcohol in violation of his parole terms, Murray attempted to elude the cruiser by maneuvering his vehicle through alleys and driveways before pulling into an alley and shutting off his engine and lights.  Murray ducked down so as not to be seen and instructed Plaintiff to do the same.
>
> Defendant and fellow officer Jason Jenkins ("Jenkins") had noticed Murray's suspicious driving and proceeded to the area where Murray had parked.  After Defendant and Jenkins began to search the area around the truck on foot, Murray started his engine and attempted to drive away.  Defendant, allegedly fearing for his and his partner's safety, fired several shots at the vehicle. Murray was fatally struck, and his truck subsequently crashed into a ditch.

R. 26/Dist. Ct. Op. at 2.  The district court noted:

> The parties greatly dispute the proximity of Murray's vehicle to the officers, the speed and erratic nature of his driving, and whether the officers were in danger of being struck by the vehicle.  These differing accounts are detailed in *Murray-Ruhl v. Passinault*, 246 Fed. Appx. 338, 340-42 (6th Cir. 2007), and need not be restated here, as these factual differences are relevant to the reasonableness of Defendant's actions – an issue not analyzed in this opinion.

R. 26 at 2 n.1.  The parties' "differing accounts" are set forth in *Murray-Ruhl*:

**The Defendants' [Passinault's and Jenkins's] Version of the Facts**

The defendants claim that after Murray started the truck, he accelerated directly toward Passinault, who was standing next to a pole barn approximately 165 feet north of the truck. Jenkins and Passinault also assert that Passinault was 'effectively trapped between the truck and the pole barn.' According to the defendants, Passinault repeatedly ordered the driver of the truck to stop, but his orders were disregarded and the driver . . . continued accelerating toward him. Passinault gave conflicting accounts of how close the truck came as it passed him, eventually testifying that it was between one and eight feet away from where he was standing when he fired the first shot at the driver. But immediately after the shooting and for some days afterward, he reported that he had been hit by the truck and injured – even going so far as to call for an ambulance to come to the scene because he needed medical attention. However, that version of the facts turned out to be a complete fabrication.

In truth, Passinault had not been hit by the truck and continued shooting after it had passed him, claiming later that he believed that the driver might be heading toward his partner, Jenkins, who was on foot somewhere in the area. Passinault also asserts that he fired at the truck as it was driven away from him because he was concerned for the safety of other officers who had been summoned to the scene and for the public in general. The vehicle was not being operated at a high rate of speed, however, and there were no other officers or members of the public in the area at the time of these events.

Later investigation revealed that Passinault had fired a total of 12 shots at the truck, at least two or three of which struck Murray. The truck eventually came to a stop in a ditch some distance down the road, with Murray slumped over the wheel, dead.

**The Plaintiff's [Murray's estate] Version of the Facts**

Because Rebecca Rodriguez was an eyewitness to what occurred, the plaintiff was able to offer a significantly different version of events, which must, of course, be viewed in the light most favorable to her. According to this account of the facts, when Murray started the truck in order to escape from the alley, he accelerated not toward Passinault but rather toward the only exit available to him. Because the officers' patrol car blocked the truck in the alley from behind, "Murray had only one option, which was to drive forward past the position of the Deputies" in order to get away. The plaintiff concedes that Murray's truck went by

Passinault at a distance of about eight feet, but asserts that he took this path only because he could not get out of the alley any other way.

Rodriguez testified that she heard Passinault yell at Murray to stop the truck only once, as opposed to the repeated orders that the defendants claim Passinault made. According to Rodriguez, after ordering Murray to stop, Passinault did not wait for a response but immediately fired his weapon. Moreover, the record tends to show that Passinault fired only that first shot before the truck passed him and was moving away, because forensic evidence fails to reflect that even one bullet struck the front of the truck or the windshield. Instead, according to Rodriguez, Passinault fired the remaining shots after the truck had already turned and driven past him. She testified, in fact, that she saw Passinault running after the truck as he continued shooting at it.

The plaintiff also contends that the fatal shot could not have been fired in self-defense because, according to the autopsy report, the shot that killed Murray would also have paralyzed his legs, yet he was able to operate the truck's gas pedal for some distance after passing Passinault. In addition, the autopsy report indicates that the bullet moved from the back of Murray's body toward the front, indicating that he was shot from behind.

The plaintiff calls into question Passinault's alleged concern for the safety of others. Although Passinault claimed that he continued shooting after the truck had passed him because he believed it was bearing down on his partner, Jenkins indicated that he was not in the truck's path and that he never felt in danger of being struck by the vehicle. The plaintiff also asserts that the officers lacked reason to believe Murray posed an ultimate threat to the general public because, despite the officers' suspicions that he might have committed a crime of some sort, the most serious offense they actually saw him commit was a traffic violation.

*Murray-Ruhl v. Passinault*, 246 F. App'x 338, 340-42 (6th Cir. 2007).

## II. *PROCEDURAL HISTORY*

In the companion case, *Murray-Ruhl*, Murray's estate filed a § 1983 action against Passinault and Jenkins, alleging that the deputies acted unreasonably in using deadly force against Murray, violating his Fourth Amendment rights. *Murray-Ruhl v. Cnty. of Shiawassee, et al.*, 2:04-cv-72615-LPZ-MKM (complaint filed July 15, 2004). Rodriguez filed an action against the deputies on September 2, 2005. *Rodriguez v.*

*Passinault, et al.* (*Rodriguez I*), 2:05-cv-73416-LPZ-MKM.  The same district court judge presided over both cases.

In *Murray-Ruhl*, the district court granted the defendants summary judgment on qualified- immunity grounds.  After Murray-Ruhl appealed, the parties in *Rodriguez I* stipulated that Rodriquez would voluntarily dismiss her case without prejudice, and that she "shall have 30 days" to re-file from the date the Sixth Circuit decides *Murray-Ruhl*. R. 18, *Rodriguez I*.

On *Murray-Ruhl*'s appeal, this Court affirmed the grant of summary judgment to Jenkins and reversed as to Passinault.  The Court reasoned that, under the plaintiff's version of the facts, 1) "a jury could find that no reasonably competent officer would have shot the victim, thus satisfying the first prong in *Saucier*'s[1] two-pronged qualified immunity analysis," *Murray-Ruhl*, 246 F. App'x at 346, and 2) "a reasonable jury could conclude that Murray posed no danger to the officers or the general public . . . and [in such circumstances] *Tennessee v. Garner*[, 471 U.S. 1 (1985),] provides a 'clearly established' right that fulfills the second prong of the qualified immunity analysis." *Id.* at 347.  The mandate affirming Jenkins's dismissal and reversing as to Passinault issued September 26, 2007.

On October 23, 2007, Rodriguez re-filed her complaint, naming only Passinault[2] as a defendant, and alleging violations of the Fourth and Fourteenth Amendments under § 1983.[3]

---

[1] *Saucier v. Katz*, 533 U.S. 194 (2001).

[2] Passinault's counsel filed a Suggestion of Death on December 11, 2007, stating that Passinault passed away on May 30, 2007 (i.e., months before Rodriguez re-filed her complaint).

[3] Passinault asserts that this court should affirm the grant of summary judgment on the alternative ground that Rodriguez's re-filed complaint was untimely because it was filed outside the 30-day deadline. Passinault maintains that the 30 days started running on August 29, 2007, the date this court's unpublished decision issued in *Murray-Ruhl*, while Rodriguez maintains that the *Murray-Ruhl* mandate dated September 26, 2007 started the clock running.  The district court's opinion noted the parties' divergent arguments in this regard and concluded that it would treat Rodriguez's re-filed complaint as timely for purposes of the summary judgment motion.  R. 26 at 3 n.2.
    We reject Passinault's argument for several reasons.  Sixth Circuit Internal Operating Procedure 41 provides that the mandate "is the document by which this court relinquishes jurisdiction and authorizes the originating district court . . . to enforce the judgment of this court."  Also, as Rodriguez argues, it was reasonable for her to assume that the *Murray-Ruhl* defendants might move for rehearing, and they had until

The district court granted Passinault summary judgment and dismissed *Rodriguez II*, concluding that Rodriguez was not seized within the meaning of the Fourth Amendment because Passinault did not know that she was a passenger in Murray's truck, because she was not actually shot, and, in any event, because Passinault was entitled to qualified immunity. This appeal ensued.

## III.

We review the district court's grant of summary judgment *de novo*. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 246 (6th Cir. 2010). The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. "[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . . , nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement . . . , but only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original); *see also Slusher v. Carson*, 540 F.3d 449, 454 (6th Cir. 2008) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("[a] 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen.") (alterations and quotations omitted.)[4]

---

September 12, 2007, to do so. Further, Passinault answered Rodriguez's re-filed complaint in December 2007, and the parties thereafter engaged in consensual scheduling, conferences with the district court, discovery, and expert evaluations, without Passinault raising the claim that Rodriguez failed to timely re-file her complaint. We thus reject Passinault's argument that he was entitled to summary judgment on this ground.

[4]Where a plaintiff complains of an unreasonable seizure, the claim is more properly analyzed under the Fourth Amendment than the Fourteenth Amendment's substantive due process provision, since the former is a "more explicit textual source of constitutional protection." *Graham*, 490 U.S. at 395. *See also Phelps v. Coy*, 286 F.3d 295, 299-300 (6th Cir. 2002) ("Which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between . . . . If the plaintiff was a free person . . . and the use of force occurred in the course of an arrest or other seizure . . . [then] the plaintiff's claim arises under the Fourth Amendment and its reasonableness standard." (internal citations omitted)).

A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable. *Graham*, 490 U.S. at 394-95. We review the district court's determination that no seizure occurred *de novo*, and its underlying factual findings for clear error. *United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir. 1995).

**A.**

The district court in the instant case concluded that no seizure occurred, declining to apply this Court's decision in *Fisher v. City of Memphis*, 234 F.3d 312 (6th Cir. 2000). Rodriguez asserts that *Fisher* is controlling and that under *Fisher*, she was seized. She further maintains that this Court's decision in the companion case of *Murray-Ruhl* determined that Passinault's actions were unreasonable. Passinault argues that the district court correctly declined to apply *Fisher* and relied instead on *Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160 (11th Cir. 2005).

**B.  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989).**

Both *Fisher* and *Troupe* relied on language in *Brower*, a frequently-cited Fourth Amendment excessive-force case in which a fleeing driver was "killed when the stolen car that he had been driving at high speeds for approximately 20 miles in an effort to elude pursuing police crashed into a police roadblock." 480 U.S. at 594. The decedent's heirs brought suit under 42 U.S.C. § 1983, alleging that the respondent officers used excessive, unreasonable and unnecessary force in establishing the roadblock and thus effected an unreasonable seizure of Brower. The district court granted the respondents' motion to dismiss for failure to state a claim, concluding that establishing a roadblock was not unreasonable under the circumstances. A divided Ninth Circuit affirmed on the basis that no seizure had occurred. The Supreme Court reversed:

> In *Tennessee v. Garner*, 471 U.S. 1 [] (1985), all Members of the Court agreed that a police officer's fatal shooting of a fleeing suspect constituted a Fourth Amendment "seizure." See *id.*, at 7 []; *id.*, at 25 [] (O'Connor, J., dissenting). We reasoned that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Id.*, at 7 []. While acknowledging *Garner*, the Court of Appeals

here concluded that no "seizure" occurred when Brower collided with the police roadblock because "[p]rior to his failure to stop voluntarily, his freedom of movement was never arrested or restrained" and because "[h]e had a number of opportunities to stop his automobile prior to the impact." 817 F.2d, at 546. Essentially the same thing, however, could have been said in *Garner*. Brower's independent decision to continue the chase can no more eliminate respondents' responsibility for the termination of his movement effected by the roadblock than Garner's independent decision to flee eliminated the Memphis police officer's responsibility for the termination of his movement effected by the bullet.

The Court of Appeals was impelled to its result by consideration of what it described as the "analogous situation" of a police chase in which the suspect unexpectedly loses control of his car and crashes. See *Galas v. McKee*, 801 F.2d 200, 202-203 (CA6 1986) (no seizure in such circumstances). We agree that no unconstitutional seizure occurs there, but not for a reason that has any application to the present case. Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, see *Hill v. California*, 401 U.S. 797, 802-805 [] (1971); cf. *Maryland v. Garrison*, 480 U.S. 79, 85-89 [] (1987), but the detention or taking itself must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act. . . .

Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant – even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only where there is a governmental termination of freedom of movement *through means intentionally applied*. That is the reason there was no seizure in the hypothetical situation that concerned the Court of Appeals. The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means – his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

. . . .

[A] roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur. It may well be that respondents here preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the barrier, but we do not think it practicable to conduct an inquiry into subjective intent. . . . Nor do we think it possible, in determining whether there has been a seizure in a case such as this, to distinguish between a roadblock that is designed to give the oncoming driver the option of a voluntary stop (*e.g.,* one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (*e.g.,* one located just around a bend). In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock – and that he was so stopped.

*Brower*, 489 U.S. at 595-99 (some emphasis added).

## C.   *Fisher v. City of Memphis*, **234 F.3d 312 (6th Cir. 2000)**.

*Fisher*'s facts and procedural history are succinctly stated therein:

On March 24, 1996, Officer William Taylor of the Memphis Police Department stopped to speak to two young women. As they spoke in the middle of Speed Street, they noticed a vehicle driven by Demetria Becton ("Becton") approaching in their direction. To avoid being hit, the two women jumped onto the curb, and the Officer jumped onto the hood of his police car, simultaneously firing his gun at the car. The bullet went through the driver's side window and hit the passenger, Elitia Fisher.

As a result of this incident, Ms. Fisher filed suit against Officer Taylor in federal district court pursuant to 42 U.S.C. § 1983, alleging deprivations of her Fourth, Eighth, and Fourteenth Amendment rights. Defendant moved for summary judgment . . . . The court . . . denied the motion as to the Fourth Amendment claim, finding an issue of material

fact as to whether Defendant's actions were reasonable under the Fourth Amendment. . . .

At trial, the jury reached a verdict for Plaintiff, and awarded her [damages].

*Fisher*, 234 F.3d at 315.  On appeal, Officer Taylor argued that the district court should have instructed the jury that Fisher's wounding was accidental and thus not actionable under § 1983 or, alternatively, that the district court should have analyzed Fisher's claim as arising under the Fourteenth, rather than the Fourth, Amendment.  This Court rejected both arguments:

> Defendant is correct in noting that to state a claim under 42 U.S.C. § 1983, a Plaintiff must demonstrate more than just mere negligence. However, the intent in question is the intent to commit the act, not the intent that a certain result be achieved.  Therefore, Officer Taylor's act of firing the gun was intentional, even if the result was not one he sought to achieve.  Instructing the jury that more than negligence was required would likely confuse the jury as to the intent question . . . .
>
> Defendant's alternative argument is that the district court erred by analyzing his actions under the Fourth Amendment . . . [; he] specifically argues that this court should apply a "shock the conscience" standard . . . under the Fourteenth Amendment . . . .

In addition, the United States Supreme Court has stated that a Fourth Amendment seizure occurs when governmental termination of freedom is through means intentionally applied. *Brower v. County of Inyo*, 489 U.S. 593, 596 [] (1989).  Therefore, violation of the Fourth Amendment requires an intentional acquisition of physical control.  As a result, a seizure occurs even when an unintended person or thing is the object of the detention or taking, so long as the detention or taking itself is willful. *Id.*

In its recent decision in *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000), this Circuit applied *Brower* in determining whether a victim of an errant bullet in a shootout fell within the scope of Fourth Amendment seizure.  While recognizing that the Fourth Amendment does not apply to § 1983 claims "which seek remuneration for physical injuries inadvertently inflicted upon an innocent party by police officers' use of force while attempting to seize a perpetrator," *Claybrook* emphasized that police officers do seize any person who is a "deliberate object of their exertion of force." *Id.* at 359.  Here, Becton's car was the intended target of Defendant's intentionally applied exertion of force.

> By shooting at the driver of the moving car, he intended to stop the car, effectively seizing everyone inside, including the Plaintiff. Thus, because the Defendant "seized" the Plaintiff by shooting at the car, the district court did not err in analyzing the Defendant's actions under the Fourth Amendment.

*Fisher*, 234 F.3d at 317-19.

### D. *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867 (6th Cir. 2000).

The parties and the district court each cited *Scott*, in which police gunfire inadvertently struck Patricia Scott, a passenger in a vehicle fleeing from police whose presence was unknown to Pierce, the defendant officer who shot at the vehicle. Police had observed Robert Scott race erratically through a stop sign at high speed, and pursued the Scott car at high speeds for over twenty minutes. Several other police cruisers joined the chase. After the pursued vehicle crashed, Pierce arrived at the car first. A collision between the two occurred, after which Pierce exited his patrol car. The pursued vehicle then accelerated toward Pierce, causing him to jump out of the way, and proceeded directly toward another officer's approaching vehicle, racing to return to the highway:

> At the moment that the Chevrolet was racing once again onto the public motorway, Deputy Pierce believed that its operator had earlier tried to run down Sheriff Anderson, had attempted to drive over him (Pierce) only moments previously, and posed a grave immediate menace to the lives and limbs of his approaching colleagues as well as innocent highway travelers. The plaintiff has not contested Pierce's avowal that he did not know that a passenger was also inside the vehicle. Confronted with a momentous, split-second, life-or death decision, defendant Pierce initially reacted by firing five bullets towards the Chevrolet's driver; he then discharged an additional four rounds at that vehicle's tires, causing it to skid to a stop for the second, and final, time. Pierce's hail of bullets had failed to injure the driver, Robert Scott. Unfortunately however, two of his shots had inadvertently struck plaintiff Patricia Scott, whose presence as a passenger was unknown to Pierce.

. . . .

> [U]pon perceiving that Patricia had been wounded, they radioed for a medical evacuation helicopter . . . . [D]octors discovered one bullet lodged inside her skull and a second gunshot imbedded within her right shoulder.

*Scott*, 205 F.3d at 872-73. Patricia Scott filed suit under § 1983, claiming that the defendants used excessive force to seize her, as well as violations under the Fourth and Fourteenth Amendments. The district court denied the defendant officers summary judgment on qualified-immunity grounds, assuming for summary-judgment purposes "that Patricia, as a voluntary cohort of Robert's whom, following the shooting, the defendant officers forcibly removed from the inoperative Chevrolet and immediately handcuffed, was an intended target of an official seizure," *id.* at 876, and ruled that material issues of fact remained regarding the reasonableness of Patricia Scott's seizure, and "whether the defendants were objectively unreasonable under the dictates of law which was clearly established on the incident date." *Id.* at 874. The defendants appealed.

This court held that, as a matter of law, Pierce's "faulted actions were objectively reasonable, and thus did not violate the Fourth Amendment. Pierce justifiably fired at the fleeing vehicle in order to seize its occupant(s); his actions therefore could not violate the Fourth Amendment rights of any unknown passenger who may have been injured by his actions. Thus, Pierce is entitled to qualified immunity." *Id.* at 878.

> In the cause *sub judice*, the district court presumed, *for summary judgment purposes*, that Patricia, as a voluntary cohort of Robert's whom, following the shooting, the defendant officers forcibly removed from the inoperative Chevrolet, and immediately handcuffed, was an intended target of an official seizure at all times pertinent, [footnote quoted below] thereby triggering the Fourth Amendment's comparatively relaxed "objective unreasonableness" standard of proof . . . On appeal, the defendants-appellants have conceded that their summary judgment motion should be assessed under the Fourth Amendment, rather than the Fourteenth Amendment.

*Scott*, 205 F.3d at 876. In a footnote, *Scott* stated:

> Accordingly, this review need not resolve whether a factual issue would otherwise exist for trial regarding whether, at the time that Pierce discharged his weapon into the moving Chevrolet's passenger compartment, the defendants intended to seize any passenger in that vehicle other than the driver, which in turn would determine which constitutional proviso would control the plaintiff's charges. *See*

> *Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000) (explaining that the constitutional tort action of a citizen who had been inadvertently wounded while inside a parked automobile during a police shoot-out with an armed felony suspect in the parking lot must be scrutinized under Fourteenth Amendment standards because the record proof was uncontested that the defendant peace constables had been unaware that anyone had been inside that vehicle and did not intend to seize anyone who might be inside that car).

*Scott*, 205 F.3d at 876 n.15.

### E.　*Troupe v. Sarasota Cnty., Fla.*, 419 F.3d 1160 (11th Cir. 2005).

In *Troupe*, a 17-member SWAT team was assigned to serve a felony drug arrest warrant for Ryan Hart and a search warrant for Hart's residence. The SWAT team was told that Hart had 40 previous arrests, 19 convictions, and "was out on bond for attempted murder and was known to run from the police and for his violent tendencies." 419 F.3d at 1163. While the SWAT team was en route, Hart and two other males – later identified as Robinson and Waiters – left Hart's house and got into a vehicle. The SWAT team surrounded the vehicle with guns drawn and yelled commands for Hart and the passengers to open the doors and surrender. Hart, the driver, revved the engine and moved the car in jerking motions. The vehicle made a hard left so that it was facing the road, at which time one of the defendant officers, Gooding, "fired a single shot at a low angle, aiming for the lower portion of the tire." 419 F.3d at 1164. "The shot missed the tire and, apparently, did not strike anyone or anything." *Id.* Another defendant officer, Bauer, saw the car coming directly at him, fired two shots at the driver, and jumped out of the car's way as it swept past him. One bullet struck the driver's door and the other hit Hart in the back. None of the shots hit Robinson or Waiters. Hart accelerated, left the yard, turned onto a road and drove over 0.3 miles, including through an intersection without slowing. The car then "approached an officer's unmarked vehicle, slowed down, made a sharp move to the right to avoid oncoming traffic . . . and went onto the grass and sidewalk, crashing into a concrete wall." 419 F.3d at 1164-65. Hart and Robinson were pronounced dead at the scene. Waiters sustained blunt force trauma injuries to the skull. *Id*. at 1165.

The plaintiffs in the consolidated cases were Troupe (Robinson's personal representative) and Waiters. The district court granted the defendants summary judgment. The 11th Circuit agreed with the district court's determinations that the defendants were not the proximate cause of the plaintiffs' injuries (concluding that it was Hart's reckless driving, and not Bauer's decision to use deadly force, that caused the death and injury of the plaintiffs), that the defendants' use of deadly force was reasonable under § 1983, and that the defendants were entitled to qualified immunity. However, the *Troupe* court disagreed with the district court's determination that the plaintiffs had been seized, noting that an *attempted* seizure does not constitute a seizure and that "stopping a vehicle's driver does not constitute seizure of the passengers." *Troupe*, 419 F.3d at 1167.

## F.   The district court's decision

The district court in the instant case discussed and distinguished *Fisher,* and declined to "*sua sponte* broaden" *Fisher*'s holding. The court concluded that *Scott* did "not compel a finding that an unknown passenger is seized when an officer fires at a moving vehicle, and in any event, the [*Scott*] plaintiff[] . . . [was] struck by the officer's gunfire, unlike [Rodriguez.]" The district court found the Eleventh Circuit's decision in *Troupe*, 419 F.3d 1160, persuasive:

> Plaintiff was neither a hostage nor an innocent bystander, but rather an unknown – and intentionally concealed – passenger in Murray's vehicle. *Fisher* is silent as to whether the officer was aware of the presence of passengers in the car. While some courts have questioned, in dicta, whether an unknown passenger might be seized, *see, e.g., Scott v. Clay County, Tenn.*, 205 F.3d 867, [876] n.15 (6th Cir. 2000); *Herman v. City of Shannon, MS*, 296 F. Supp.2d 709, 712 n.3 (N.D. Miss. 2003), *aff'd*, 104 Fed. Appx. 398 (5th Cir. 2004), other courts have suggested that an unknown passenger would not be seized. *See, e.g., Edenfeld*, 2006 WL 1041724, at *10; *Tubar*, 453 F. Supp. 2d at 1256. *Scott* and *Herman* do not compel a finding that an unknown passenger is seized when an officer fires at a moving vehicle, and in any event, the plaintiffs in both cases were struck by the officer's gunfire, unlike Plaintiff.
>
> . . . .
>
> The Court finds *Troupe* persuasive. Like the plaintiffs in *Troupe*, Plaintiff was not shot and was injured only in the subsequent crash.

> Whereas the *Troupe* plaintiffs were known passengers, Plaintiff was not, which further compels a finding that she was not seized. While Plaintiff maintains that, despite *Troupe*, a seizure may be effectuated in a fleeing vehicle case without the target actually being shot, such cases discuss the seizure of the vehicle's driver and do not discuss an unknown passenger. *See Flores v. City of Palacios*, 381 F.3d 391, 396-97 (5th Cir. 2004); *Carlson v. Lunsford*, No. 05-1025, 2007 WL 470437, at *5 (W.D. Tenn. Feb. 8, 2007).
>
> Plaintiff has not identified a single case holding that an unknown passenger, who was not shot, is seized under circumstances analogous to the present.

R. 26/Dist. Ct. Op. at 7-10.

## IV.  *ANALYSIS*

We do not agree with the district court that applying *Fisher* to the instant case would extend *Fisher*'s holding. Under *Fisher*, an officer's intentionally applied exertion of force directed at a vehicle to stop it effectuates a seizure of all occupants therein. 234 F.3d at 318-19. Factually, the instant case is like *Fisher* in that it involved an officer's shooting at a moving vehicle in order to stop it, resulting in injury to the passenger. That *Fisher* does not mention whether the police were aware of the passenger's presence in the vehicle does not render *Fisher* inapplicable to the instant case.

*Troupe*, on the other hand, bears little resemblance to the instant case. Here, after two or more of Passinault's shots struck Murray in the back, one of which paralyzed Murray, the truck continued moving for a brief time and crashed into a ditch, with Murray dead at the wheel. In *Troupe*, the fleeing vehicle continued its flight for more than .3 miles and crashed into a concrete wall only after sharply veering to avoid oncoming traffic. Although a bullet struck the driver, it did not effect a seizure of the vehicle; it was the vehicle's later crash that stopped the vehicle and caused the death of the driver and a passenger, and injury to the other passenger. That is, the gunfire in *Troupe* did not cause the vehicle to stop, and there was thus no seizure. To be sure, the *Troupe* court did say, in the course of discussing whether there had been a seizure:

[S]topping a vehicle's driver does not constitute a seizure of a passenger. *See County of Sacramento v. Lewis,* 523 U.S. 833, 844 [] (1998), citing *Brower,* 489 U.S. at 596-97 []. Thus, when Bauer shot Hart that did not constitute a seizure of the passengers.

419 F.3d at 1167. But that statement was made without any analysis, and the cited case, *County of Sacramento,* does not so hold. Other cases, however, do stand for the proposition that seizure of a car to protect a hostage does not constitute seizure of the hostage.[5] These cases are fairly distinguishable on the basis that in a hostage situation there is no intentional acquisition of physical control of the hostage; rather the intention of the officer is manifestly not to seize, but rather to liberate, the hostage.

Here the intent to stop the vehicle was the same as in *Fisher,* and *Fisher* controls:

By shooting at the driver of the moving car, he intended to stop the car, effectively seizing everyone inside, including the Plaintiff. Thus, because the Defendant "seized" the Plaintiff by shooting at the car, the district court did not err in analyzing the Defendant's actions under the Fourth Amendment.

*Fisher,* 234 F.3d at 318. Nor does the fact that the passenger in *Fisher* was struck by police gunfire, while Rodriguez was not, render *Fisher* inapplicable here. The district

---

[5]The district court noted these cases. *Childress v. City of Arapaho,* 210 F.3d 1154 (10th Cir. 2000) (hostages); *Claybrook v. Birchwell,* 199 F.3d 350 (6th Cir. 2000) (undetected passenger); *Medeiros v. O'Connell,* 150 F.3d 164 (2d Cir. 1998) (hostage); *Rucker v. Harford Cnty.,* 946 F.2d 278 (4th Cir. 1991) (bystander); *Landol-Rivera v. Cruz Cosme,* 906 F.2d 791 (1st Cir. 1990) (hostage). These cases are generally based on *Brower*'s statement distinguishing intentional acts from unintended consequences:

The Fourth Amendment "addresses misuse of power, . . . not the accidental effects of otherwise lawful government conduct." *Landol-Rivera,* 906 F.2d at 795 (quoting *Brower,* 489 U.S. at 596) (internal quotation marks omitted) (alterations in original). The claim presented in this case vindicates no interest protected by the Fourth Amendment. So far from seeking to restrain Joshua's freedom, the troopers' every effort was bent on delivering all the hostages from deadly peril. *See Medeiros v. Town of South Kingstown,* 821 F.Supp. 823, 827 (D.R.I. 1993) (rejecting the Fourth Amendment claim of a passenger who asserted that he was imprisoned in the fleeing car by the police officers' high speed chase, stating that "the police did not intend to restrict the movement of the passenger by causing the driver to flee at high speeds. In fact, their intent was the exact opposite . . . .").

. . . . But where the hostage is hit by a bullet intended for the hostage-taker, the mishap is the "unintended consequence[ ] of government action," and the governing principle is that such consequences cannot "form the basis for a fourth amendment violation." *Ansley v. Heinrich,* 925 F.2d 1339, 1344 (11th Cir. 1991).

*Medeiros,* 150 F.3d at 168-69.

court's apparent belief that Rodriguez could not maintain an excessive force/unreasonable seizure Fourth Amendment claim without having been shot goes against established law, i.e., that under the Fourth Amendment's reasonableness standard, excessive force claims generally require at least *de minimis* physical injury. *See Morrison v. Green Tp. Bd. Of Trustees*, 583 F.3d 394, 406-07 (6th Cir. 2009); *Carpenter v. Bowling*, 276 F. App'x 423, 427 (6th Cir. 2008) (unpublished). Although the district court properly determined that Rodriguez was not struck by gunfire, it did not take into account that Rodriguez testified on deposition that she was injured by flying glass caused by the gunfire. Thus, a genuine issue of material fact remained whether Passinault's gunfire resulted in physical injury to Rodriguez. Additionally, in contrast to *Troupe*, the vehicle here crashed due to Murray being shot, not his careless driving. Thus, as in *Fisher*, the injury was sustained due to the seizure of the vehicle.

Given *Fisher*, the district court should not have looked outside the Sixth Circuit for guidance.

## V.

Rodriguez argues that "the unreasonableness of [Passinault's] action was decided by this Court in the companion case of the driver, *Murray-Ruhl v. Passinault, et al.*, . . . which found a justiciable issue as to Defendant Deputy Passinault's actions." Pl.'s Br. at 10. Passinault argues that the law-of-the-case doctrine does not apply here because *Murray-Ruhl* decided only that there were questions of fact as to whether Passinault used excessive force *against Murray,* the fleeing suspect driver. The district court here did not purport to address the reasonableness of Passinault's use of force in the context of the Fourth Amendment.

The Supreme Court in *Graham* explained:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with

it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham*, 490 U.S. at 396-97. *See also Scott*, 205 F.3d at 876-77.

*Murray-Ruhl*, 246 F. App'x at 340, concluded that because the record reflected genuine disputes of material fact concerning the reasonableness of Passinault's action, summary judgment on qualified immunity grounds was inappropriate:

[I]f Passinault had fired a single shot as the truck came at him – or even as it passed close to him – the district court's findings of fact . . . might be subject to deference on appeal. But one fact glaringly obvious from the record is that Passinault emptied his weapon at the vehicle, reloaded it, and fired at Murray perhaps as many as a dozen times even after the truck had passed him and, thus, after Passinault could reasonably believe that it imposed a threat to himself or – if Deputy Jenkins is to be believed – to his partner. It was one of these "after shots" that proved to be fatal.

At the very least, this record creates a dispute of fact concerning whether events unfolded as the defendants claim in contending that they are entitled to qualified immunity and whether their actions can be said to have been objectively reasonable under those circumstances. Indeed, the reasonableness of the use of deadly force turns entirely on which version of the facts one accepts.

*Murray-Ruhl*, 246 F. App'x at 344.

Although the law-of-the-case doctrine may be inapplicable here,[6] the parties' disparate factual accounts clearly demonstrate that questions of fact remain whether Passinault's acts were objectively reasonable in light of the facts and circumstances confronting him. *Graham*, 490 U.S. at 396-97.

## VI.

This court reviews the district court's grant of qualified immunity *de novo*. *Carver v. City of Cincinnati*, 474 F.3d 283, 285 (6th Cir. 2007). The plaintiff bears the ultimate burden of demonstrating that the defendant is not entitled to qualified immunity. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 605 (6th Cir. 2006).

If the legal question of immunity is completely dependent on which view of the facts the jury accepts, the district court should not grant summary judgment on the issue. *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989); *see also Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) ("[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force.").

We agree with Rodriguez and the *Murray-Ruhl* panel that Passinault's entitlement to qualified immunity depends on which party's version of the facts a jury

---

[6]*Rodriguez I* and/or *Rodriguez II* were not consolidated with *Murray-Ruhl*; they were separate cases. Thus, technically, the law-of-the-case doctrine is not applicable here. Even if the cases had been consolidated, consolidation under Fed. R. Civ. P. 42 does not render rulings in one case applicable to a consolidated action. *See, e.g., Kraft, Inc. v. Local Union 327, Teamsters*, 683 F.2d 131, 133 (6th Cir. 1982) ("Consolidation . . . does not merge the suits into a single cause, or change the rights of the parties or make those who are parties in one suit parties in another.").

accepts, and therefore disagree with the district court's determination that Passinault was entitled to summary judgment on qualified immunity grounds.

**VII.**

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.